# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**GOVERNMENT EMPLOYEES**          *
**HEALTH ASSOCIATION,** on behalf    *
of itself and all others similarly situated,    *
                                       *
*Plaintiff,*                          *

v.                                   *          Civil Case No: 1:18-cv-03560-GLR

**ACTELION PHARMACEUTICALS**
**LTD., et al,**
                                       *
*Defendants.*

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## MEMORANDUM OPINION AND RECOMMENDATION[1]

Before the Court is Plaintiff Government Employees Health Association's Motion for

Spoliation-Related Sanctions. (ECF No. 194). The basis for Plaintiff's Motion concerns the

deletion of Electronically Stored Information ("ESI") from five custodians who were former

employees of Defendants Actelion Pharmaceuticals Ltd., Actelion Pharmaceuticals US, Inc.,

and/or Janssen Research and Development, LLC (collectively, "Actelion"): Michael Flinn,

Terry Cato, Lisa Wong, Juniette Kang'a, and Shalom Jacobovitz (the "at-issue custodians").

(ECF No. 194-1 at pp. 9–12).[2] Plaintiff seeks to introduce evidence concerning the deletion at

trial, requests an adverse inference instruction, argues to exclude three of Actelion's defenses,

---

[1] Because Plaintiff's Motion seeks non-dispositive relief pursuant to Federal Rule of Civil Procedure 37, which addresses discovery violations, and this matter was referred by Judge Russell, the U.S. District Judge presiding over this case, to the undersigned for all discovery and related scheduling, the undersigned's authority derives from 28 U.S.C. § 636(b) and Local Rule 301.5.a. as to such relief, subject to a "clearly erroneous" standard of review by Judge Russell. However, because Plaintiff also seeks to strike three of Actelion's defenses (ECF No. 194-1 at pp. 32–34), this aspect of relief could be construed as "dispositive," so as to limit the undersigned's authority over this aspect of relief to a "recommendation" pursuant to Local Rule 301.5.b and change the standard of review by Judge Russell to a *de novo* determination as to the undersigned's ruling on striking these affirmative defenses.

[2] When the Court cites to a specific page range, it is referring to the page numbers provided within the electronic filing stamps located at the top of every electronically filed document.

and seeks attorney's fees and costs based on spoliation. *Id.* at p. 7.  The Court has also reviewed Actelion's Opposition (ECF No. 200) and Plaintiff's Reply (ECF No. 203).  The Court denied Actelion's Motion to File Sur-Reply (ECF No. 206), but without prejudice to Actelion's ability to raise the arguments contained therein at the hearing on the Motion, which was held on January 17, 2023.  As set forth more fully below, the Court will GRANT in part and DENY in part Plaintiff's Motion.

## I.    BACKGROUND

Actelion is a drug manufacturer and Tracleer is one of its products.  More than ten years ago, generic manufacturers anticipated the expiration of Actelion's patents on Tracleer and prepared to enter the market with a generic version.  Those manufacturers requested samples of Tracleer from Actelion to assist them in developing such a generic version.  Based on alleged intentional and unjustified delays by Actelion in that process, the generic manufacturers had litigation with Actelion that was resolved by settlement in April of 2014.[3]

The instant antitrust litigation, though similar in many of its allegations, does not include generic manufacturers.  Instead, the case *subj judice* is brought by a purported class of those forced to pay higher prices for Tracleer due to the unavailability of a cheaper generic version caused by Actelion's actions in effectively blocking competition by withholding samples from

---

[3] Additionally, the U.S. Department of Justice pursued Anti Kick-back litigation against Actelion, claiming that in 2014–2015 Actelion violated the False Claims Act by illegally reimbursing Medicare patients for their co-pay portion of Tracleer and other drugs to incentivize them to purchase those drugs.  *See* Press Release, Department of Justice, Drug Maker Actelion Agrees to Pay $360 Million to Resolve False Claims Act Liability for Paying Kickbacks (Dec. 6, 2018), https://www.justice.gov/opa/pr/drug-maker-actelion-agrees-pay-360-million-resolve-false-claims-act-liability-paying.  It does not appear that this prior litigation involved specific allegations against Actelion for blocking the development of generic drugs.  A subpoena to Actelion in that action did include, *inter alia*, documents concerning "any pricing strategy or other business plan concerning [Tracleer and other drugs]," (ECF No. 194-24, Ex. 21 at p. 10), and included two of the at-issue custodians—Jacobovitz and Cato—in a long list of data custodians.  (ECF No. 194-25, Ex. 22 at pp. 2, 4).  However, in the context of that investigation, the Court is not convinced that such a request would necessarily include any strategy on the development of generic versions of Tracleer.  Although the precise date of Actelion's settlement of that litigation is not before the Court, the press release announcing the settlement is dated December 6, 2018, two days after the present lawsuit was served.

generic manufacturers.  Actelion defends, in part, by arguing that the samples were withheld due to certain regulations of the Food and Drug Administration ("FDA"), in particular the FDA's Risk Evaluation Mitigation Strategies ("REMS") regulation, as well as other legitimate business strategies.

This case was filed on November 19, 2018, and it was served on December 4, 2018. (ECF Nos. 1 & 28).  On December 20, 2018, Johnson and Johnson ("J&J"), which had purchased Actelion in June of 2017 and was managing the data of the combined companies, instituted a "legal hold" to preserve relevant information for this case.  (ECF No. 194-21, Ex. 18 at ¶ 18).  At the January 17, 2023 hearing, Actelion explained that the Actelion data custodians included in the legal hold were determined by its in-house counsel at the time, Rahsaan Thompson, who had also been involved in the earlier litigation with the generic manufacturers. None of the five at-issue custodians were included on Thompson's legal hold list.

Because some Actelion employees did not join J&J after its acquisition of Actelion in 2017, J&J was making decisions as to whether the ESI of these former employees would be retained as it was migrating the Actelion data to the J&J platform.  In making these decisions, J&J relied on Thompson to advise which departed Actelion employees' data was subject to an existing legal hold, whether in the instant case or any other matter.  *Id.* at ¶¶ 16–22; (ECF No. 194-22, Ex. 19 at 169:6–10).  In the fall of 2019, well after this lawsuit had been filed and served, J&J sent Thompson a list purporting to contain the names of all former Actelion employees not otherwise subject to a legal hold, asked for verification of the list, and informed him that custodial data for these former Actelion employees on the list was scheduled for deletion.  (ECF No. 194-6, Ex. 3 at ¶ 3).  According to J&J, in consultation with J&J's outside counsel, Thompson confirmed the deletion list, which included all five of the at-issue custodians.

*Id.* at ¶ 3–4.[4]  At the January 17, 2023 hearing, Actelion clarified that Thompson verified the proposed deletion list by comparing the names on that list to the earlier legal hold list that Thompson had previously drafted for the instant case when the hold was first instituted.  Because the five at-issue custodians were not on Thompson's original legal hold list for this case,  the custodial data,[5] including email data and, in some cases, the data from their Home Directory files,[6] for the at-issue custodians was deleted between September 6 and September 11, 2019.  *Id.* at ¶ 4.  At the January 17, 2023 hearing, Actelion verified that Thompson left J&J at around that time.

On September 30, 2019, Judge Russell dismissed the case for failure to state a claim. (ECF No. 50 & 51).  On October 30, 2019, Plaintiff filed an appeal.  (ECF No. 52).  On April 13, 2021, the Fourth Circuit reversed and remanded the case.  (ECF No. 55).  The case was reinstated, and a new scheduling order was entered by Judge Russell on May 24, 2021.  (ECF No. 61).  The parties then embarked on discovery.

Apparently unaware that the email data and, in some cases, Home Directory files for the five at-issue custodians had already been deleted in September of 2019, prior outside counsel for Actelion first identified one of the at-issue custodians, Terry Cato, in its June 21, 2021 initial disclosures.[7]  (ECF No. 194-11, Ex. 8 at p. 4).  In Actelion's initial list of eight proposed

---

[4] Citing attorney-client privilege, Thompson refused to confirm that he authorized the deletion at his deposition. (ECF No. 194-22, Ex. 19 at 162:2–163:25).

[5] As used by the Court here, "custodial data" refers to data in a custodian's email "mailbox" and, as to two of the at-issue custodians, Wong and Flinn, data in their Home Directory files.  As will be discussed below, other custodians might themselves have copies of some of the deleted data, such as if they were the recipient of an email message sent from one of the at-issue custodians or were the sender of an email message sent to or copied to one of the at-issue custodians.

[6] Only Wong and Flinn had ESI in their Home Directory files.  (ECF No 200-3, Ex. 1 at pp. 22–23).

[7] Cato, along with Flinn, had also been identified in the initial disclosures associated with the prior lawsuit with the generic manufacturers that resolved in 2014.  (ECF No. 194-10, Ex. 7 at p. 4).  That disclosure would have been reviewed by Thompson as Actelion's in-house lawyer at the time.  (ECF No. 194-22, Ex. 19 at 153:4–154:1).

custodians dated July 21, 2021, its prior counsel also included, among others, two more of the at-issue custodians: Michael Flinn and Lisa Wong.  (ECF No. 194-4, Ex. 1 at p. 5).  Plaintiff did not suggest adding either of the two remaining at-issue custodians, Kang'a and Jacobovitz, in its September 10, 2021 response, but it did suggest adding Cato (based on her inclusion in Actelion's initial disclosures) and six others.  *Id.* at p. 9.

By correspondence dated September 21, 2021, prior counsel for Actelion advised for the first time that, in fact, it no longer possessed custodial data for three of the five at-issue custodians:  Flinn,[8] Wong, and Cato.  *Id.* at pp. 13–14.  Actelion's explanation was that the custodians "left Actelion before it was acquired by Johnson & Johnson ("J&J") in 2017 and, as we have explained before, the associated process of data migration has left Defendants without data for some personnel who left the company around or before the time of acquisition."  *Id.* at p. 13.  In its response dated September 29, 2021, Plaintiff expressed "surprise" and "concerns" about this disclosure.  *Id.* at p. 20.  Plaintiff, while reserving its rights, proposed adding Juniette Kang'a, who reported to Ms. Cato (who, in turn, reported to Mr. Flinn), as a custodian because Ms. Kang'a's files "may contain some of what would have been contained in Ms. Cato's files, and potentially, Mr. Flinn's files as well."  *Id.*  Plaintiff also proposed adding the names and email addresses of Flinn, Wong and Cato as search terms "in order to identify responsive correspondence that they may have sent or received."  *Id.*

By correspondence dated October 7, 2021, Actelion's prior counsel advised that, for the same reasons given for Flinn, Wong, and Cato, it possessed none of Kang'a's data either.  *Id.* at p. 29.  Actelion's prior counsel instead proposed adding Jean-Marc Bellemin, a senior vice-president at Actelion, to whom Mr. Flinn (and therefore Cato and Kang'a) reported.  *Id.*

---

[8] Actelion ultimately located and produced some post-May 2013 emails from Mr. Flinn that had avoided deletion. (ECF No. 194-1 at p. 17, n.5).

Actelion also agreed to add the names and email addresses of Flinn, Wong, and Cato as search terms as Plaintiff requested.  By correspondence dated October 14, 2021, Plaintiff agreed to the proposal to add Mr. Bellemin as a custodian, and further requested that Ms. Kang'a's name and email address—like that of Flinn, Wong, and Cato—be added as a search term. *Id.* at p. 38.  The parties at that time also agreed to search ESI for fourteen other Actelion custodians, not including the five at-issue custodians.  (ECF No. 194-4, Ex. 1 at pp. 38–39).

Thus, as of October 2021, Actelion had disclosed that it did not possess custodial data for four of the five at-issue custodians; the fifth, Mr. Jacobovitz, had not yet been requested. Additionally, the parties had collaborated and reached an agreement on a way to address the missing data: adding Mr. Bellemin as a custodian and adding the names and email addresses of the four then-known at-issue custodians as search terms.  As it turned out, adding Mr. Bellemin ultimately led to the production of more than 22,000 documents, including some documents that go to the very issues about which Plaintiff claims a lack of responsive information from Actelion.  (ECF No. 200-2, Declaration of Julia Chapman at ¶ 25; ECF No. 200 at p. 15, n.8 (pointing out that Plaintiff's Ex. 10, an email regarding a request for samples and REMS compliance from Mr. Flinn, copying Ms. Cato and Mr. Bellemin, came from Mr. Bellemin's data collection)).  As further support for Mr. Bellemin's data being at least a partial remedy for the deletion of other data, the Court notes that at the January 17, 2023 hearing, Plaintiff highlighted other correspondence from Mr. Bellemin that arguably supported an intent to delay providing samples to the generic manufacturers. *See, e.g.*, (ECF No. 203-5, Ex. 32).

On March 16, 2022, Plaintiff first requested that Mr. Jacobovitz—and others—be added as additional custodians.  (ECF No. 200-3, Ex. 1 at p. 10–11).  Mr. Jacobovitz was President of Actelion from 2004–early 2013.  Plaintiff, suspecting that Mr. Jacobovitz's data might also be

lost, alternatively proposed that his executive assistant, Lori Gutierrez, be added as a custodian

because she "is thus likely to possess many of the same documents as he would." *Id.* at p. 11,

n.1.  Plaintiff also suggested adding Mr. Jacobovitz's email address as a search term as had been

done with the other at-issue custodians whose data was missing.  *Id.*  In correspondence dated

April 21, 2022, Actelion, now represented by current counsel, opposed the requested additions

and the proposed solution for Mr. Jacobovitz, and Actelion also confirmed Plaintiff's suspicion

that it possessed none of Mr. Jacobovitz's data "because he left Actelion before its acquisition

[by J&J]."  (ECF No. 194-4, Ex. 1 at p. 64).[9]

On April 26, 2022, Plaintiff, in reference to the absence of data for Mr. Jacobovitz,

stated:

> We understand your letter to mean that Mr. Jacobovitz's files were lost in the
> "process of data migration" associated with the J&J acquisition, as Defendants'
> prior counsel represented was the case for other proposed custodians. (*See* Sept.
> 21, 2021 Ltr. from D. Hernandez.) If that understanding is incorrect, please let us
> know.

*Id.* at p. 74.  Plaintiff further requested that Actelion "disclose the specific timing and

circumstances of Defendant's failure to preserve those documents . . . ."  *Id.* at p. 75.

On May 6, 2022, Actelion wrote two separate letters to Plaintiff.  In the first, Actelion

resisted adding additional custodians (including Mr. Jacobovitz), and indicated that the

circumstances surrounding the deletion of Mr. Jacobovitz's data would be separately responded

to, reading in pertinent part:

> Because your letter seeks to re-hash arguments with respect to Defendants'
> document and discovery obligations in this matter, I refer you to my colleague
> Julia Chapman's letter of today regarding those complaints rather than address
> them here.

---

[9] Actelion ultimately agreed to add Ms. Gutierrez as a custodian and to add Mr. Jacobovitz's email as a search term.
(ECF No. 194-21, Ex. 18 at ¶ 34; ECF No. 200-16, Ex. 14 at pp. 6–9).

*Id.* at pp. 79–80.  In the referenced second letter of May 6, 2022, Actelion stated:

> To be clear, you have provided no evidence during our extensive written exchanges or the meet and confer calls that Defendants have failed to comply with their document retention and discovery obligations in this action.  Nor has any such evidence emerged during our investigation.

*Id.* at 83.  Despite those assertions, Actelion disclosed at the January 17, 2023 motions hearing that on that same date of May 6, 2022, it obtained information suggesting that Mr. Jacobovitz's data may have been deleted in September of 2019 and was in the process of investigating same.

Because of these and other disputes, on May 18, 2022, the parties jointly requested that Judge Russell transfer discovery-related matters in this case to a U.S. Magistrate Judge.  (ECF No. 138).  The next day, Plaintiff advised Judge Russell of the nature of the then-existing disputes by letter.  (ECF No. 139-1).  As framed, the parties were at odds over two issues.  First, Plaintiff sought to add four Actelion document custodians to the fourteen previously agreed upon, including adding the fifth and final at-issue custodian, Jacobovitz.[10]  Second, Plaintiff sought discovery regarding Actelion's document preservation policy and efforts after noticing relatively fewer emails in Actelion's document production from the six-month period of November 2012 to April 2013, and after learning that email data and Home Directory data of the at-issue custodians had not been preserved after the 2017 acquisition of Actelion by J&J.  *Id.* at pp. 4–5.

On May 27, 2022, Judge Russell referred this case to the undersigned for discovery and all related scheduling.  Actelion filed a letter in opposition to adding more custodians, and again defended its data preservation efforts, stating in pertinent part:  "[I]n 2019, Defendants retained two law firms, including one that specializes in eDiscovery, to advise the company with regard

---

[10] Presumably, this was for any data beyond the deleted emails that might still exist for Mr. Jacobovitz, and/or emails of his that might reside with other custodians (*e.g.*, an email that he sent that was received by another custodian and still existed with that custodian).

to its legal data preservation obligations for historic data and to manage the data migration and consolidation process for the two merged companies [*i.e.*, Actelion and J&J]."  (ECF 149-1 at p. 3).  Actelion did not disclose that it had obtained information on May 6, 2022 suggesting that Mr. Jacobovitz's data may have been deleted in September of 2019 or that it was investigating same.

By Letter Order dated June 10, 2022, the undersigned addressed the parties' dispute. (ECF No. 152).  The Court added a fifteenth custodian, as well as adding Mr. Jacobovitz.  *Id.* at p. 2.  As for the discovery sought regarding preservation, the Court ordered that Actelion, "should produce the preservation policy in place at the time it reasonably anticipated litigation in this case, and provide a discovery response by way of interrogatory answer or declaration summarizing its efforts and timing pursuant to that policy, including . . . [the] group of former employee documents discussed below."  *Id.* at p. 4.  Additionally, while rejecting Plaintiff's argument that Actelion's preservation obligations in prior litigation extended to the current case, the Court nonetheless allowed further discovery surrounding the disposition of the at-issue custodians' documents, stating:

> However, because the disposition of these documents was significantly closer in time to the filing of this suit (which, correspondingly, is the latest that the duty to preserve in this matter would attach), Actelion should also undertake reasonable efforts to determine the disposition dates of those documents and disclose same within fourteen (14) days of the date of this Order.

*Id.*

In response to this order, Actelion provided a declaration (dated June 24, 2022) and supplement (dated July 11, 2022) from Jocelyn Hester, Legal Project Manager at J&J, confirming that the legal hold in this case was instituted on December 20, 2018, the at-issue custodians were not included in Actelion's legal hold, and the email data and Home Directory files for the at-issue custodians were therefore deleted between September 6 and September 11,

2019.  (ECF No. 194-21, Ex. 18 at p. 6,  ¶¶ 18–19; ECF No. 194-6, Ex. 3 at ¶¶ 3–4).  Actelion now acknowledges that the at-issue custodians (excluding, perhaps, Ms. Kang'a) should have been included in its original legal hold but were not.  (ECF No. 200 at p. 12, n.5).  Actelion stated at the January 17, 2023 hearing that in the process of complying with the Court's June 10, 2022 Letter Order, it confirmed Mr. Jacobovitz's data was in fact deleted in September of 2019, and it learned, for the first time, that the ESI of the other four at-issue custodians was deleted then as well.

To be clear, Actelion did produce data from the fifteen *other* Actelion custodians, as well as ESI from "non-custodial" files such as the database where Actelion stored its contracts, the file for documents related to the development of the REMS program, and a broad set of other centrally-located databases and shared folders, amounting to almost 300,000 documents comprising approximately 1.6 million pages.  (ECF No. 200-3, Ex. 1 at pp. 3–8; ECF No. 200-2, Declaration of Julia Chapman at ¶ 21).  And, as a result of the remedial measures agreed to by the parties as described above, 33,800 documents that were associated with[11] the at-issue custodians were produced by Actelion notwithstanding the prior deletion of their custodial files. (ECF 200-2, Declaration of Julia Chapman at ¶ 34).

The above facts demonstrate that ESI from the five at-issue custodians should have been preserved but was instead deleted many months after Actelion's preservation obligations arose.

---

[11] "Associated with" refers to documents from other custodians in which one of at-issue custodians' names appears in the "to," "from," "cc," or "bcc" fields in an email thread.  (ECF No. 200-2, Declaration of Julia Chapman at ¶¶ 28–34).

## II.      LEGAL STANDARD

Rule 37(e) specifically addresses the failure to preserve ESI such as that at issue here.  To trigger Rule 37(e), four criteria must be met: (1) the party was under a duty to preserve the ESI at issue; (2) the ESI at issue was not preserved; (3) the loss of the ESI was due to the party's failure to take reasonable steps to preserve it; and (4) the ESI cannot be restored or replaced through additional discovery.  Fed. R. Civ. P. 37(e); *see Eshelman v. Puma Biotechnology, Inc.*, No. 7:16-CV-18-D, 2017 WL 2483800, at *4 (E.D.N.C. June 7, 2017) (citations omitted).  If these criteria are met, Rule 37(e) offers two alternative paths:

> The first avenue, Rule 37(e)(1), requires a court to make a finding of prejudice before sanctions may be warranted.  The second avenue, Rule 37(e)(2), requires a court to make a finding that a party acted with the *intent* to deprive the opposing party of the ESI prior to imposing sanctions.

*See Mod. Remodeling v. Tripod Holdings, LLC,* No. CCB-19-1397, 2021 WL 3852323, at *10 (D. Md. Aug. 27, 2021); *In re: Ethicon, Inc.*, No. 2:12-CV-00497, 2016 WL 5869448, at *3 (S.D.W. Va. Oct. 6, 2016).  The kind of prejudice sufficient to trigger Rule 37(e)(1) occurs "when, as a result of the spoliation, the party claiming spoliation cannot present 'evidence essential to its underlying claim.'"  *Al-Sabah v. Agbodjogbe*, No. ELH-17-730, 2019 WL 4447235, at *5 (D. Md. Sept. 17, 2019) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522–23 (D. Md. 2010)).  To justify the more severe sanctions of Rule 37(e)(2), as Plaintiff mostly seeks here, the moving party must demonstrate that the failure to preserve was motivated by an intent to deprive the moving party of the use of the information in the litigation. *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, SAG-18-3403, 2020 WL 1809191, at *4 (D. Md. Apr. 9, 2020).  Negligent or even grossly negligent behavior will not suffice.  Fed. R. Civ. P. 37(e) Advisory Committee Notes; *Mod. Remodeling, supra* at *10.

The burden of proof is on the party seeking sanctions, and the standard of proof in the Fourth Circuit appears to be "clear and convincing" evidence where, as here, relatively harsh sanctions are sought. *Id.* "Courts have broad discretion when deciding to impose sanctions under Rule 37(e)." *Id*. (citations omitted). This is true even if the moving party demonstrates prejudice under Rule 37(e)(1) or "intent to deprive" under Rule 37(e)(2). *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 837, 845 (S.D.W. Va. 2018).

Notably, Rule 37(e) was amended effective December 1, 2015, and, with regard to ESI-related spoliation, according to its drafters, "forecloses reliance on inherent authority . . . to determine when certain measures should be used." Fed. R. Civ. P. 37(e) Advisory Committee Notes. In that way, compared to the previous version of the rule, the amended version of Rule 37(e) "significantly limits a court's discretion to impose sanctions for the loss or destruction of ESI[.]" *Eshelman*, 2017 WL 2483800, at *4 (quoting *Jenkins v. Woody*, No. 3:15-CV-355, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017) (citation omitted)). This is important to note because, in the absence of a finding of intent to deprive, it forecloses imposing most of the sanctions Plaintiff urges here, including an adverse inference instruction. Fed. R. Civ. P. 37(e)(2).

To the extent Plaintiff urges imposition of such sanctions based on negligence, gross negligence, etc., and/or relies on the Court's inherent authority in a manner inconsistent with current Rule 37(e), the Court disagrees. *See, e.g.*, (ECF No. 194-1 at pp. 19–27). The pre-2015 caselaw on the authority for and availability of particular sanctions for spoliation of electronic evidence and what level of intent suffices lacked clarity and consistency. As the Advisory Committee makes plain, the 2015 amendments to Rule 37(e) were specifically designed to remedy that lack of clarity and consistency. Attempts at a wholesale reconciliation of pre-

amendment jurisprudence with post-amendment Rule 37(e) risks a reinstatement of the *ad hoc* approach that the Advisory Committee sought to correct, where, under the talisman of "inherent authority," a court was free to grant or deny any potential sanction based on any state of mind from negligence to intentional bad faith. That said, it is certainly true (as some post-amendment cases point out) that some pre-amendment decisions approach ESI spoliation in a way consistent with current Rule 37(e), and such decisions remain helpful in applying Rule 37(e)(1) and (2). *See, e.g., McCoy v. Transdev Servs., Inc.,* No. DKC-19-2137, 2021 WL 1215770, at *1–3 (D. Md. Mar. 31, 2021) (citing certain pre-amendment decisions as support for the application of post-amendment Rule 37(e)). But, to the extent that such pre-amendment cases are explicitly inconsistent with current Rule 37(e) (such as justifying an adverse inference instruction on conduct falling short of a specific finding of intent to deprive), the Court no longer views them as persuasive in addressing spoliation of ESI.

## III. ANALYSIS

Turning to the facts and circumstances of the present case, it is undisputed that Actelion failed to preserve the data of the five at-issue custodians at a time when it was under an obligation to do so, given that the data was destroyed approximately eight months *after* suit was filed and more than two and half years after J&J acquired Actelion.[12] It is also clear that, although some of this data was located with other custodians, a meaningful amount of the deleted

---

[12] The Court does not suggest that the data migration was not still occurring in 2019 or was unreasonably delayed. The Court is, however, pointing out that the decision to delete was not made "under the gun" in that this timeframe allowed for careful deliberation.

data could not be restored or replaced through additional discovery.[13]  *See Mod. Remodeling,*

*supra* at *8 (finding Rule 37(e) sanctions appropriate even where some ESI was found with other

custodians).  Actelion nonetheless argues that it took reasonable steps to preserve the data so as

to preclude application of Rule 37(e), but the Court disagrees.

While it is true that the individuals *at J&J* who were handling the post-acquisition data

migration took reasonable steps to preserve data, including data that was subject to a litigation

hold (employing appropriate personnel, methodology and consultants to do so), the decision-

makers regarding legacy ESI of former *Actelion* employees did not.  Actelion never placed the

data for the at-issue custodians under the original legal hold in this case, despite acknowledging

now that it should have.  In verifying the "delete list," J&J personnel reasonably relied on

Actelion's former in-house counsel, Thompson, and Thompson had been directly involved in the

similar litigation with the generic manufacturers such that he should have been aware of the

relevance of the at-issue custodians' email data and Home Directory files, having identified at

least two of them in initial disclosures in that earlier case.  Thus, this is not a case where

individuals unfamiliar with the likely scope of discovery overlooked some peripheral sources of

ESI.  Nor is this a case where data was inadvertently destroyed during migration despite a legal

hold being in place.  Rather, although the J&J migration process reasonably relied on the

appropriate former Actelion individuals to determine what should be preserved, those individuals

neglected to identify the ESI of the at-issue custodians as information clearly relevant to the

---

[13] As previously noted, some post-May 2013 emails were eventually located for Mr. Flinn.  Additionally, although approximately 33,800 documents associated with the at-issue custodians were recovered from other custodians, Plaintiff reasonably estimates that more than 83,000 documents were lost from just the two at-issue custodians for whom the amount of lost data can be reconstructed.  (ECF No. 194-1 at p. 10, n.3).  Further, both sides acknowledge a decreased volume of emails during the relevant time period from the *preserved* custodians, lending further support for the assumption that the missing ESI from the at-issue custodians is at least a partial explanation for that. Allowing that some of that data may not have been responsive to Plaintiff's discovery requests, it is reasonable to conclude that a significant amount of the missing data was not "replaced."

underlying case notwithstanding their familiarity with the issues from this and the prior lawsuit with the generics manufacturers, and their previous identification of at least some of the at-issue custodians in prior initial disclosures.

That such relevance existed cannot be disputed. Outside counsel for Actelion, presumably unaware of the deletion, subsequently identified four of the at-issue custodians as likely having relevant data. The fifth, Jacobovitz, though not requested until well after discovery had begun, had been president of Actelion for a large portion of the relevant time period. This negates a conclusion that reasonable steps were taken by Thompson, the former Actelion in-house lawyer (appropriately delegated this task by J&J) to preserve the email data and Home Directory files for the at-issue custodians prior to their September 2019 deletion.

That said, Plaintiff has not carried its burden of proving that Actelion had an intent to deprive it of the lost ESI at the time it was deleted, a finding necessary for the most severe of the sanctions Plaintiff seeks. That is, a "lack of reasonable steps" to preserve does not equate with an "intent to deprive." Such a failure to preserve must be viewed under all the circumstances. First, Actelion has produced hundreds of thousands of other ESI "documents," amounting to approximately 1.6 million pages, including from fifteen other Actelion data custodians—not including the at-issue custodians—and from non-custodial central sources (such as databases and shared folders). In some cases, these include custodians who were the direct superiors of (such as Mr. Bellemin who provided more than 22,000 documents), or were direct support to (such as Ms. Gutierrez who provided 2500 documents), the at-issue custodians, and Actelion ultimately produced more than 33,000 documents that were associated with the at-issue custodians. (ECF No. 200-2, Declaration of Julia Chapman, at ¶¶ 24–25, 34). This included information regarding the REMS program from three custodians directly involved in it, and it included information

from Actelion's in-house counsel, Thompson, who had legal oversight over requests for Traceleer samples.  (ECF No. 200 at pp. 19–20).  This belies an intentional plan to deprive Plaintiff of relevant ESI in this litigation.

Second, highlighting at least four of the five at-issue custodians in initial disclosures and initial discussions regarding the scope of discovery with Plaintiff, thereby drawing attention to those custodians, is inconsistent with an earlier intent to deprive Plaintiff of their data.  While it is hypothetically possible that, independent from its outside counsel, Thompson, on behalf of Actelion, had such earlier intent, his preservation of significant volumes from other custodians belies such intent.  Additionally, as represented at the January 17, 2023 hearing, the at-issue custodians were never on the preservation list for this litigation when it was originally drafted almost a year before the deletion took place.  While they no doubt should have been on the original list, and while this verification process provided a second opportunity for Actelion to correct its oversight, the months-long separation between the decision not to preserve their data and the decision to delete also provides some evidence undermining intent to deprive in that one would expect such deletion to occur closer in time to institution of the litigation hold.

Moreover, one of the five at-issue custodians could not have been on anyone's early radar: Kang'a was not even suggested as a custodian until it was discovered that data for Flinn, Cato, and Wong was not available.  Had the September 2019 deletions been intentional, a nefarious party would also have had to have been somewhat omniscient as well.  Finally, Actelion indicated at the January 17, 2023 hearing that Thompson left Actelion in September of 2019, cutting against any incentive that Thompson might otherwise have had to intentionally delete data for Actelion in this litigation.

Given all the circumstances, it is just as likely that Thompson approved the deletion through inattention. A quick comparison of the proposed deletion list with the earlier preservation list led to a decision that facially looked "correct" even if its error should have been caught. As mentioned, neither negligence nor even gross negligence satisfies the "intent to deprive" standard. Additionally, the earlier generics litigation with manufacturers had concluded in 2014. The Government investigation was largely unrelated and had concluded within four days of the instant Complaint being served. Discovery had not commenced in this case. A fully ripe motion to dismiss was pending and was granted by the end of September 2019. Even if there were obvious deficiencies in the preservation process, as Actelion now acknowledges, the evidence does not support a conclusion that Actelion acted with the requisite "intent to deprive" at the time of the deletion. *See In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.,* 299 F.R.D. 502, 521 (S.D.W. Va. 2014) (noting that defendant's preservation process was "riddled with holes[,]" yet finding insufficient evidence of intention to deprive); *see also Knight*, 323 F. Supp. 3d at 860–61 (S.D.W. Va. 2018) (although emails were lost in "transition from one legal hold system to a different legal hold system," remedial measures by the parties resulted in at least some of that lost ESI being produced by other data custodians who were the senders or receivers of those emails).

In terms of the alleged subsequent "cover-up," based on a review of the materials presented by the parties, Actelion did not—as Plaintiff contends—consistently maintain to Plaintiff that the data was destroyed in 2017 at the time of the J&J acquisition despite knowing all along that it had deleted responsive data after its duty to preserve arose. As noted above, early in the discovery period, Defense Counsel identified four of these five at-issue custodians as likely having responsive data, something inconsistent with an earlier plan to intentionally delete

that data and deprive Plaintiff of its use.  And while Thompson certainly knew that he approved the J&J deletion list in September of 2019, there is no information that he realized his error prior to departing Actelion at about that same time.  Rather, Actelion consistently stated that the data was lost during the data migration that followed, a process that was continuing in September of 2019.  Based on information presented at the January 17, 2023 hearing, Actelion did not realize that the ESI for the at-issue custodians may have actually been deleted in September of 2019 as part of that migration until May of 2022, which it did not fully confirm until July of 2022.  While it is troubling that Actelion had information in May of 2022 (at a time it was still representing that all of its preservation efforts had been appropriate) that ESI for at least one of the at-issue custodians—Jacobovitz—may have been deleted in September of 2019, that deletion was not confirmed, and the ESI deletion date for all five at-issue custodians was disclosed shortly thereafter.

Even viewing these events through the lens that Plaintiff urges does not demonstrate by clear and convincing evidence—or even a preponderance of the evidence—that Defendants' actions in 2019 were done with an intent to deprive.[14]  This is especially so against the backdrop of thousands of pages of records being produced by more than a dozen custodians, including those just as likely to have responsive information as the at-issue custodians.  Accordingly, the Court denies Plaintiff's Motion to the extent it seeks an adverse inference instruction or barring

---

[14] The Court also does not view as significant the fact that Defendants' initial response to the Court's order on June 24, 2022, did not disclose the precise date of deletion given that by supplemental affidavit dated July 11, Defendant did disclose the precise dates of deletion.  (ECF No. 194-6, Ex. 3 at ¶¶ 4–5).

of certain defense arguments/affirmative defenses as such relief is not available absent the requisite showing of specific intent under Rule 37(e)(2).[15]

Plaintiff urges that Actelion's conduct here is similar to that alleged in *QueTel Corp. v. Abbas*, No. 17-cv-471 (AJT/JFA), 2018 WL 8997471 (E.D. Va. Jan. 19, 2018), *aff'd.*, 819 F. App'x 154 (4th Cir. 2020), a case where the court entered judgment against the spoliating party. The Court finds important differences.  First, in *QueTel* (an infringement case), there was an almost complete loss of all relevant data when the spoliating party intentionally destroyed the entire computer on which it allegedly designed the infringing software, as well as continued spoliation of the source code and related files during the discovery process.  *Id.* at *2.  Here, data from fifteen other custodians was preserved, and 1.6 million pages were produced, including more than 33,000 "associated documents" from the at-issue custodians.  Second, the extent of the lack of candor by the spoliating party in *QueTel* was more significant, with the spoliating party denying not only that the computer had been destroyed, but also denying that the source code and related filed ever existed.  Here, Actelion never denied that the data at one time existed and was lost, disclosing same early in discovery.  Additionally, Actelion worked with Plaintiff to provide data from other sources in mitigation.  Based on the record and representation of counsel at the January 17, 2023 hearing, the date of destruction was not first appreciated by Actelion until May 6, 2022, and was not confirmed until late June or July 2022, at which point it was disclosed.  Though the Court is troubled that such disclosure came only after this Court's June 10, 2022 Letter Order, the Court presumes that even absent that order, counsel of this esteemed reputation would nonetheless have disclosed it once it was confirmed.

---

[15] Plaintiff argues in its Reply that the striking of only three of Actelion's thirty-three defenses could be justified under 37(e)(1).  (ECF No. 203 at pp. 23–24).  The Court disagrees.  The three defenses that Plaintiff seeks to strike are among the core of Actelion's justifications for not providing samples to the generic manufacturers on a more timely basis.  And as mentioned, Plaintiff was provided additional ESI and witnesses to address these issues.

That said, Plaintiff is not completely without a remedy.  Plaintiff also requests a less

drastic sanction, presumably under Rule 37(e)(1), to allow it to "present evidence of spoliation at

trial . . . ." (ECF No. 194-1 at p. 7).  This, of course, requires a finding of prejudice and must be

a remedy tailored to alleviate such prejudice.  Actelion argues that it is Plaintiff's burden to show

prejudice, but the Advisory Committee cautions that it may be unfair to place the burden on the

moving party to show prejudice for the destruction of information it has never seen.  Fed. R. Civ.

P. 37(e)(1) Advisory Committee Notes ("Determining the content of lost information may be a

difficult task in some cases, and placing the burden of proving prejudice on the party that did not

lose the information may be unfair.").  At the same time, the Advisory Committee also warns,

"Care must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have

the effect of measures that are permitted under subdivision (e)(2) . . . ."  Fed. R. Civ. P. 37(e)

Advisory Committee Notes.

Mindful of this, in looking at all the circumstances, the Court concludes that Plaintiff has

demonstrated some prejudice.  The information should have been preserved, as Actelion

acknowledges, and some portion of it was likely relevant.  Actelion itself identified four of the

five custodians as having relevant information, including two in its initial disclosures and two

others in its discussions with Plaintiff concerning the most likely repositories of discoverable

information.  The fifth custodian, while not so identified by Actelion (and, in fact, not included

by Plaintiff in its initial list of custodians), was Actelion's president during the relevant time

period and someone with authority (even if not on a day-to-day basis) over the distribution of

Tracleer samples.  While some of the lost data was partially replaced as noted above, there is

little doubt given just the amount of lost data from the two at-issue custodians for whom such

information is known, that a meaningful amount of relevant information was destroyed, and

those custodians were not peripheral to the central issues in the case, even if not uniquely integral to them.

Having found prejudice to Plaintiff caused by Actelion's failure to preserve, the Court must fashion a remedy "no greater than necessary to cure the prejudice." *Id.* Of course, there is no way to know whether such lost information was directly supportive of Plaintiff's theory or Actelion's defense (or both, or neither). Additionally, as noted above, the deleted information was not entirely unique to the at-issue custodians (as more than 33,000 documents associated with the at-issue custodians were produced), nor to the issues that Plaintiff raises (as demonstrated by the number of other custodians directly involved in these issues). Moreover, though the deletion occurred well beyond the time Actelion's duty to preserve attached (as it now acknowledges), the timing of that is not directly relevant to how the prejudice should be cured. That is, the destruction is no more or less prejudicial based on the timing of when it occurred, and the cure to that prejudice should similarly not be more or less arduous based on that timing.

In looking for an appropriate cure, the Court is mindful of how the parties themselves, in significant part, devised the appropriate cure to such prejudice during discovery when it was disclosed that the data was destroyed but the timing of the destruction was not yet known. First, to mitigate the prejudice due to the loss of Ms. Cato's, Mr. Flinn's, and Ms. Wong's data, the parties agreed to add their boss, Jean-Marc Bellemin, who was senior to them, whose tenure was coincident with them, and who subsequently produced more than 22,000 responsive documents. Similarly, Plaintiff proposed the addition of Lori Gutierrez, Mr. Jacobovitz's Executive Assistant, who Plaintiff argued at the time "is thus likely to possess many of the same documents as he would[,]" and ultimately did produce more than 2,500 documents. The parties also

included names and email addresses of the at-issue custodians in their search terms.  In all, these

measures uncovered tens of thousands of responsive documents.  But the Court recognizes that,

to the extent any of the at-issue custodians plays a role at trial (whether through direct testimony,

reference, key documents, or otherwise), Plaintiff may have been able to offer, as direct or

impeachment evidence, some of the missing data but cannot do so given Actelion's failure to

preserve.  The jury might, in turn, be tempted to speculate as to why Plaintiff did not offer more

documentary evidence from one or more of the at-issue custodians.  Given the amount of data

likely lost, both concerns are not mere hypotheticals.

     With all of this in mind, the Court concludes that the remedy should somehow account

for the missing data without conferring undue advantage to either side or running afoul of the

Advisory Committee's admonition against Rule 37(e)(1) remedies that are *de facto* Rule 37(e)(2)

remedies.  The Court also believes that it should fashion a remedy that provides some deterrence

as future litigants consider their obligations.  The Court believes that some instruction is

appropriate and leaves to Judge Russell as the trial judge the ultimate decision on the exact

wording of such an instruction.  The precise instruction given would also have to consider the

role, if any, that the five at-issue custodians and/or their documents ultimately play at the trial.[16]

The instruction would then be customized to only include those at-issue custodians who testified,

were consistently referred to at trial, or whose documents played a meaningful role at trial.  The

sample instruction below addresses the situation where all five had such a role, but this could be

tailored to some lesser number as appropriate:

> You are instructed that some electronically stored information for the following
> former Actelion employees was not preserved by Actelion, despite a duty to do
> so:  Michael Flinn, Terry Cato, Juniette Kang'a, Shalom Jacobovitz, and Lisa
> Wong.  You should not speculate as to what that electronically stored information

---

[16] The Court understands, for example, that only one of the five, Mr. Jacobovitz, was deposed in the case.  (ECF No. 200 at p. 20).

might have included, or which party (if any) it might have supported.  However, you should not conclude based merely on any perceived absence of this information from these five individuals that Plaintiff has failed to meet its burden of proof.  Rather, you should consider all the evidence and testimony in the case in determining whether the parties have or have not met their respective burdens without regard to which side produced it or the relative volume of information each side produced.

Finally, the Court declines to award fees and costs associated with the instant Motion as much of the motion was aimed at Rule 37(e)(2) sanctions, for which Plaintiff has not met its burden.  The Court will, however, award one half of the fees and costs to Plaintiff in drafting ECF No. 139-1, as one half of the relief sought (*i.e.*, Plaintiff's request for "preservation" discovery versus its request for additional custodians) ultimately led to the disclosure that Actelion's deletion occurred after its duty to preserve arose, so as to trigger potential remedies under Rule 37(e).  But for Plaintiff's effort, it is unlikely that timing would have otherwise been determined in as timely a fashion.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Spoliation-Related Sanctions (ECF No. 194) is GRANTED in part and DENIED in part. A separate order follows.


Date: <u>January 19, 2023</u>                                   <u>                    /s/                    </u>
                                                                J. Mark Coulson
                                                                United States Magistrate Judge